**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| AR Design Innovations LLC, | |
| Plaintiff, | Civil Action No. 4:20-cv-392-SDJ (Lead) |
| v. | Civil Action No. 4:20-cv-395-SDJ |
| Ashley Furniture Industries, Inc. and | |
| La-Z-Boy Incorporated, | CONSOLIDATED CASE |
| Defendants. | JURY TRIAL DEMANDED |

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................3

I.      INTRODUCTION .......................................................................................5

II.     LEVEL OF ORDINARY SKILL IN THE ART ........................................7

III.    ARGUMENTS ............................................................................................8

  A.    Claims 1 and 30 of the '572 Patent Require an Ordered Process ............8

  B.    "Apply" (or "Applying") "Luminosity Characteristics"........................11

    1.    "Luminosity Characteristics"......................................................11

    2.    "Apply" or "Applying" ...............................................................13

  C.    "Render"/"Rendering" and "Rendering…[Render] a Photorealistic 3D View".......................................................................................................15

    1.    "Render" or "Rendering".............................................................15

    2.    "Photorealistic" and "Rendering…[render] a photorealistic 3D view." .............................................................................................18

  D.    "Reconfiguring" or "Reconfiguring" and "Selectively Reconfiguring [Reconfigure] the 3D Image in Real Time"........................................21

  E.    "Plurality of Views"...............................................................................22

  F.    "3D Scene" or "Scene"...........................................................................24

  G.    "3D Image of the Composite"................................................................26

  H.    "First Rendering Engine" and "Second Rendering Engine"..................27

  I.    "Integrated Product Ordering Information"...........................................31

  J.    "Customized Graphical Document" .......................................................33

# TABLE OF AUTHORITIES

**Cases**  **Page**

*Amgen Inc. v. Sandoz Inc.*,
923 F.3d 1023 (Fed. Cir. 2019)...................................................................... 8, 10

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
616 F.3d 1249 (Fed. Cir. 2010)........................................................................... 29

*Computer Docking Station Corp. v. Dell, Inc.*,
519 F.3d 1366 (Fed. Cir. 2008)........................................................................... 18

*Cybor Corp. v. FAS Techs., Inc.*,
138 F.3d 1448 (Fed. Cir. 1998)............................................................................. 6

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
815 F.3d 1314 (Fed. Cir. 2016)............................................................................. 5

*Estech Sys., Inc. v. Target Corp.*,
Case No. 2:20-cv-00123-JRG-RSP, Dkt. 159 (E.D. Tex. Mar. 21, 2021)................... 29

*Fuzzysharp Techs. Inc. v. Intel Corp.*,
2013 WL 5955668 (N.D. Cal. Nov. 6, 2013). ..................................................... 25

*Gree, Inc. v. Supercell Oy*,
2020 WL 2476497 (E.D. Tex. May 14, 2020)....................................................... 29

*Kaneka Corp. v. Xiamen Kingdomway Group Co.*,
790 F.3d 1298 (Fed. Cir. 2015)............................................................................. 8

*Legend Films, Inc. v. West Wing Studios, Inc.*,
2006 WL 6086298 (C.D. Cal. Jan. 25, 2006) ..................................................... 14

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
133 F.3d 1473 (Fed. Cir. 1998)............................................................................. 6

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)........................................................................ 5, 14

*Purdue Pharma L.P. v. Endo Pharm. Inc.*,
438 F.3d 1123 (Fed. Cir. 2006)........................................................................... 18

*Seven Networks, LLC v. Apple Inc.*, Case No.
2:19-cv-115-JRG, 2020 WL 1536152 (E.D. Tex. Mar. 31, 2020) .............................. 5

*Tech Pharmacy Servs., LLC v. Alixa RX LLC*,
2016 WL 6397358 (E.D. Tex. Oct. 28, 2016) ............................................................... 14

*Versata Software, Inc. v. SAP Am., Inc.*,
2009 WL 1408520 (E.D. Tex. May 19, 2009) ............................................................... 14

I.    **INTRODUCTION**

In this case, Plaintiff asserts infringement of eighteen claims of the '572 patent.  In its preliminary identification of terms for construction, Plaintiff initially proposed five clauses for construction that substantially overlap with many of the terms that are currently in dispute.  But after seeing the overlap with Defendants' identification of claim terms, Plaintiff flipped its position and now contends that only two terms in the eighteen claims require construction.

Similarly, Plaintiff initially indicated that it would rely upon expert testimony to support its positions and rebut Defendants' constructions, but never submitted any such testimony. Additionally, while contending "plain and ordinary meaning" for the vast majority of terms, Plaintiff did not submit a single dictionary definition in support of its proposals, instead relying upon attorney argument to contend for term after term that a lay-person would understand the meaning of the term, while intentionally avoiding any explanation or delineation of what the terms mean within the context of the '572 patent.  In contrast, not only are Defendants' constructions supported by the claims and specification, but also expert testimony and contemporaneous dictionary definitions.

Furthermore, Plaintiff (incorrectly) argues that the "lay" meaning of the disputed terms is known, but that is irrelevant: the question here is how a POSITA would have interpreted the claim language in this field and in light of the intrinsic and extrinsic evidence.  Plaintiff's brief even concedes that there is confusion and disputes regarding the meaning of the claim terms in question.  Under well-established Federal Circuit precedent, this Court has the responsibility to determine the scope of the asserted claims, and "a determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361

(Fed. Cir. 2008).  It would be legal error for the Court to leave such questions unresolved.  *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1319-20 (Fed. Cir. 2016) (reversing district court, as "[b]y only determining only that the terms should be given their plain and ordinary meaning, the court left this question of claim scope unanswered, leaving it for the jury to decide. This was legal error.").

Rather than focus on the law and the evidence, Plaintiff instead attacks Defendants with unfounded assertions, including dismissive treatment of this Court and inconsistent positions across the parallel proceedings.  *See* Br. 2.  Defendants do not dispute requesting construction of additional terms before this Court – that is a logical result as PTAB proceedings are limited to the specific prior art and grounds raised in a petition, rather than broader invalidity and non-infringement issues.  Indeed, courts in this District have rejected baseless arguments like these in the past, and the Court should do so here as well.  *See, e.g., Seven Networks, LLC v. Apple Inc.*, Case No. 2:19-cv-115-JRG, 2020 WL 1536152, at *6 (E.D. Tex. Mar. 31, 2020) (rejecting challenge to claim construction position taken in district court because "Plaintiff fails to show why the absence of any proposed construction from Defendant in an IPR proceeding precludes Defendant from arguing for a construction in the present litigation.").  Plaintiff's attacks are further unfounded where it was Plaintiff's identification of proposed terms for construction that required responsive constructions from Defendants.  Batts Dec., Ex. A (identifying six phrases for construction).  After dropping its proposals, Plaintiff now confuses the issues by arguing over its own proposed claim terms.  *Compare id. with* Batts Decl., Ex. C.  In an effort to focus briefing and reduce the remaining disputes, Defendants have addressed Plaintiff's arguments first raised in its opening briefing and revised their constructions for "plurality of views," "3D scene or "scene," and "integrated product ordering information."

At bottom, the Court is faced with stark differences between the parties – a Plaintiff avoiding an explanation or support for adoption of a nebulous "plain and ordinary meaning" for term after term, contrasted with Defendants' detailed explanations, evidence, and testimony supporting their constructions.

## II.    LEVEL OF ORDINARY SKILL IN THE ART

As a threshold matter, the Court must determine the level of skill of a person of ordinary skill in the art (a "POSITA").  *See Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998) ("It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed."); *accord Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1478 (Fed. Cir. 1998) (Rader, C.J., concurring in part) (noting that "claim construction requires … assessment of the level of ordinary skill in the art").  Plaintiff's failure to address this threshold question is yet another flaw in its claim construction approach.

As described by Mr. Goodin in his report, the person of ordinary skill in the field of art (POSITA) of the '572 patent would have had a bachelor's degree in electrical engineering, computer engineering, computer science, or a similar field, with at least two years of industry experience working in the field of computer graphics.  Dkt. 75-4, Goodin Rep. 10.  A person with less education but more relevant practical experience may also meet this standard.  Defendants' unrebutted proposed level of ordinary skill is supported by the patent and the prior art disclosed in the Defendants' invalidity contentions and should be adopted.  *Id.*

In addition, the POSITA would have had the skills to perform the following that relate to the claimed aspects of the '572 patent:

- Develop a client application capable of communicating with a remote server, and featuring a GUI that could facilitate display and user interaction with a 3D scene.  A POSITA would have gained awareness and familiarity with the tools that would allow for

such development (*e.g.*, Windows Foundation Classes) through academic coursework and

basic industry experience, that would have imparted – *inter alia* – a basic understanding

of computer programming.  *See* Dkt. 75-4, Goodin Rep. 11.

- Generate and render a photorealistic 3D perspective view of a 3D object that could be selectively positioned and manipulated within a 3D scene (running on either a client or server).  A POSITA would have known how to do this because it was well-known at the time how to utilize APIs that enabled interaction with a graphics processor, such as OpenGL and DirectX.  *Id.*

- Implement specific rendering techniques to produce realistic lighting effects, such as ray tracing, radiosity, shadowing, layering, and texturing effects – and any combinations thereof.  A POSITA would have known how to do this because the algorithms needed to implement these types of luminosity effects were well-known at the time.  A POSITA would have gained awareness and familiarity with these algorithms through academic coursework and basic industry experience (*e.g.*, the Foley textbook), and because tools to implement these effects were widely known and available – for example, for free (*e.g.*, Blender), or for purchase through a variety of commercially-available 3D rendering and design software products (*e.g.*, LightWorks, HOOPS 3D, Lightscape, etc.).  *Id.*

### III.    ARGUMENTS

**A.    Claims 1 and 30 of the '572 Patent Require an Ordered Process**

Claims 1 and 30 should be construed to require that the method steps be performed in the

order laid out by those claims.  As to claim 1, after steps (a) and (b) are performed (sequentially

or simultaneously), steps (c) through (k) must be performed in order.  As to claim 30, steps (a)

through (j) must be performed in order.  When a method claim "actually recites an order" for the

method steps, the ordinary construction of such a claim requires the recited order.  *Kaneka Corp.*

*v. Xiamen Kingdomway Group Co*., 790 F.3d 1298, 1306 (Fed. Cir. 2015) ("Where the steps of a method claim actually recite an order, we ordinarily construe the claim to require order.").

This result is reinforced because, as a matter of logic and grammar, the language of claims 1 and 30 require those lettered process steps to be performed in the order presented – a conclusion that is itself supported by the repeated use of temporal and/or ordering language throughout the specification explaining the steps in the methods described in claims 1 and 30. *Amgen Inc. v. Sandoz Inc.*, 923 F.3d 1023, 1028 (Fed. Cir. 2019) (confirming that "a process claim is properly limited to a certain order of steps when the claim language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires' an order of steps.") (internal quotation omitted); *see also Kaneka Corp.*, 790 F.3d at 1306-07 (holding that even a method claim that does not actually recite an order "can … be construed to require that steps be performed in order where the claim implicitly requires order, for example, if the language of a claimed step refers to the completed results of the prior step.").  The sequentially-lettered steps in claims 1 and 30 are organized and presented in a deliberate manner through which the initial elements of those claims introduce actions performed by a user (or by the underlying computer system) that yield results or outputs that are expressly required for performance of the subsequent steps later in the recited method.  For example, with respect to claim 1, the client application must display the 3D scene, as described in step (c), before the 3D scene can be configured "for being selectively displayed in a plurality of views," as described in step (d) – and only after all previous steps have been performed in sequence can the user manipulate the 3D object "within the composite for placement and orientation" as described in step (g) (as the "composite" was only created in step (f)).  As another example, all of the preceding steps (a)-(j) in claim 1 must be performed prior to step (k), as the "composite image" with luminosity characteristics that is rendered in step (k) is generated through the performance of steps (a)-(j).

Claim 30 requires performance of essentially the same steps, in the same ordered process, as does claim 1.  This structure would be familiar to a POSITA, as it "reflects how a great majority of 3D design applications that operated in a client-server environment worked in fact."  Dkt. 75-4, Goodin Rep. 13-14.

The intrinsic evidence is rife with examples demonstrating that the lettered steps presented in claims 1 and 30 were designed and intended to be performed in a sequential manner.  For example, the flow-chart depicted in FIG. 5 presents a workflow for the methods described in claims 1 and 30.  In describing the operations shown in FIG. 5 and in many other places in the specification, temporal and/or ordering language is used to indicate that the steps in the process described in claims 1 and 30 are meant to be performed in sequential order.  '572 pat., 11:16-37 (describing the "initial operation" or "room planning," which is followed by user editing of the room "as desired," which in turn is followed by the user's addition of "objects … selected from local object library 42 and/or online library 41" and manipulation of those objects "for position (*e.g.*, placement, rotation) and property (*e.g.*, texture, color, etc.) – and then, "[o]nce the room plan is substantially complete, rendering options may be applied … for example, luminosity effects.").)  There are many additional examples of the specification's usage of temporal and/or ordering language to describe the sequence in which the lettered steps of claims 1 and 30 are to be performed.  *See id.*, 12:59-61 ("Room Planning 110 (FIG. 5) is logically a first step for users wishing to design and render a scene."), 14:43-49 (stating that "higher level (e.g., photorealistic rendering 126 may be accomplished once the planning phase is substantially complete"), 12:50-53, 16:12-15, 17:3-5, and 35:3-36:9.

Plaintiff concedes – as it must – that "[o]f course, certain steps [of the claims] logically should be performed prior to others."  Br. 29.  Plaintiff is incorrect, however, that as a matter of logic and grammar (putting aside the fact that the steps are presented in an actual, sequentially-lettered order), that the later steps in claim 1 can be performed in any order.  *Id.* at 29-30.  For example, step (j) ("applying luminosity characteristics to the 3D image") cannot be performed simultaneously or

before steps (g) or (i) – as Plaintiff suggests – because the "3D image" to which the luminosity characteristics are applied in step (j) does not even exist until step (h), and is not reconfigured to queue the application of luminosity characteristics until step (i).  According to the precepts of claim construction outlined above, it is clear that the structure and language of claims 1 and 30 dictate that they be construed to recite an ordered process.

Plaintiff's assertion that it is theoretically possible for the sequentially-lettered steps of claims 1 and 30 to be performed simultaneously, or out of sequential order, is at best an infringement theory based on the doctrine of equivalents.  *See, e.g.*, *Amgen*, 923 F.3d at 1028-29 (affirming that a claim consisting of sequentially-lettered steps was properly construed as an ordered process, and evaluating whether defendant's "one-step" process could therefore be found to infringe the asserted claim through the doctrine of equivalents as such process could not be found to literally infringe the claim).  The validity of such an argument is highly dubious.  *See id.* at 1029 (rejecting argument that a "one-step" process can be found to infringe a claim that "recites a sequence of steps" because "the doctrine of equivalents cannot be used effectively to read out a claim limitation.").  Regardless, such an argument has no bearing in the context of claim construction.

## B.    "Apply" (or "Applying") "Luminosity Characteristics"

Claims 1 and 26-30 each recite "applying" (or "apply") "luminosity characteristics to the 3D image."  This limitation presents two disputes:  the meaning of "luminosity characteristics" and the meaning of "applying" luminosity characteristics to the 3D image.

### 1.    "Luminosity Characteristics"

The parties agree that "luminosity characteristics" requires construction.  In the context of the claims and the specification, "luminosity characteristics" means an effect that represents the interaction of light with surface characteristics within a virtual environment.

The claims do not expressly define luminosity characteristics.  The specification merely gives non-limiting examples of luminosity effects:  "For example, luminosity effects, including ray tracing, radiosity, shadow effects, layering, texturing, and combinations thereof, may be automatically applied to simulate the effect of natural light at a particular geographic location, orientation (e.g., North, South, East, West), time of year, and time of day."  *See* '572 pat., 11:29-34.  Thus, the specification illustrates that luminosity characteristics refers to known graphical effects for representing light in computer graphics, consistent with prior art dictionary definitions for "luminosity."  *See, e.g.,* Dkt. 75-5 at 16 (defining "luminosity" as "the relative quantity of radiation emitted by a light source."), 60 (defining "luminosity," *inter alia*, as "the relative quantity of light," or "brightness.").

Mr. Goodin explained that a POSITA would have understood that luminosity characteristics "relate to the modeling of various qualities and aspects of light, and how the various objects within a scene interact with that light, because computer graphics developers had been working to build rendering engines that were capable of integrating lighting effects into 3D objects through the conventional graphics rendering pipeline for at least two decades prior to the Priority Date, and because techniques and algorithms for doing so were part of basic computer graphics courses and textbooks…."  Dkt. 75-4, Goodin Rep. 28.  The luminosity effects recited by the specification (*e.g.*, ray tracing and shadows) are examples of techniques used to represent the interaction of light with surface characteristics within a virtual environment.  *Id.* at 28-29.

Plaintiff's construction should be rejected because it relies on the false premise that the specification expressly defines "luminosity characteristics."  *First*, the specification does not expressly define "luminosity characteristics" because it refers to "luminosity effects" instead.  *Second*, the specification only provides non-limiting examples of luminosity effects.  It does not

provide a definition that can be used to determine whether other types of effects (*e.g.*, effects not enumerated in the specification) are also luminosity effects. This is underscored by the Plaintiff's argument that a large portion of the alleged express definition is optional.

Plaintiff's remaining arguments misinterpret the specification. Plaintiff argues that a luminosity characteristic does not have to accurately depict lighting in the virtual world. Br. 14-15. But, the specification at 7:12-17 (consistent with Defendants' construction) describes that embodiments of the alleged invention "represent changes in both natural and artificial light," and the only optional aspect (referring to the clause set off by "in particular embodiments") is finer-grained functionality (specifically, "precise as to depict lighting associated with a particular exposure during a particular season at a predetermined hour..."). The specification at 11:29-34 also does not suggest that accurate representation of light is optional. Instead, the recitation of "may" indicates that the *automatic application* of luminosity effects is optional.

### 2.    "Apply" or "Applying"

In the context of the claims and the specification, "apply" and "applying" means "add" and "adding," respectively. This construction is supported by the specification, which indicates that the terms "apply" or "applying" are used consistently with "add" or "adding"—which is one of the several potential meanings of the term "apply." For example, the specification describes how modules can be used to "*add* effects such as lighting customized for location, season, and/or time of day." '572 pat., 10:6-15. The specification also uses the term "apply" in a context that means, in substance, "add" in numerous similar examples in the specification. *See also id.*, 11:28-34 ("Once the room plan is substantially complete, rendering options may be applied ... for example, luminosity effects, including ray tracing, radiosity, shadow effects, layering, texturing, and combinations thereof, may be automatically *applied* to simulate the effect of natural light at a particular geographic location, orientation ...."), 15:3-5 ("Advanced editing

tasks may also be effected to enhance the look and feel of the 3D objects by *applying* advanced lighting and shadow effects so as to render a photorealistic 3D feel."), 35:17-20 ("Default materials are *applied* to the walls after they are created, and camera view 208 is updated upon the creation/addition of a new entity….").

As Mr. Goodin explains, the meaning of the term "apply" or "applying" is aligned with Defendants' construction "because the systems and/or applications in existence as of the Priority Date of the '572 patent that enabled computer graphics professionals to create photorealistic 3D scenes and 3D objects typically presented their users with the option to superimpose lighting effects on the subject 3D scene or object after the initial configuration and rendering of the subject scene or object had been performed – thus, in essence, allowing the designer to 'add' the selected luminosity effect to the 3D scene or object."  Dkt. 75-4, Goodin Rep. 26.  Further, dictionary evidence is consistent with Mr. Goodin's testimony.  *See, e.g.*, Dkt. 75-5 at 59 (defining "apply" as "[t]o bring into nearness or contact with something; put on, upon, or to," for example to "appl[y] glue")), at 4 (defining "apply," *inter alia*, as to "lay or spread on" – *e.g.*, to "overlay" (as to "sand the wood before [apply]ing the varnish"), or to "superpose" (as to "[apply] one triangle upon another")).

Plaintiff leaves unanswered what "apply" means in the context of the '572 patent if not "add."  Plaintiff offers no evidence of the plain and ordinary meaning of "apply" or "applying."  Without any evidence in the record, there is nothing to support Plaintiff's argument that Defendants' construction fails to accurately convey the plain and ordinary meaning of "apply" and "applying."  Plaintiff's position that "apply" and "applying" are used in ordinary lay English is irrelevant because the legal test is to determine the ordinary and customary meaning of the term to a POSITA in the field of computer graphics.  For example, "applying" for a job

(*e.g.*, submitting a resume) is a conventional meaning for "apply" that would make no sense in this context.  Plaintiff's argument is belied by the fact that other courts have found reason to construe the term "apply."  *See, e.g.*, *Legend Films, Inc. v. West Wing Studios, Inc.*, 2006 WL 6086298, at *2 (C.D. Cal. Jan. 25, 2006) (construing "applying" as "putting to use"); *Versata Software, Inc. v. SAP Am., Inc.*, 2009 WL 1408520, at *9 (E.D. Tex. May 19, 2009) (construing "applying" as "determine how to use and use in the manner determined").

**C.      "Render"/"Rendering" and "Rendering…[Render] a Photorealistic 3D View"**

Claims 1 and 30 recite "rendering, with the client application, a photorealistic 3D view of the composite image, including the luminosity characteristics."  Claims 26-29 recite "a second rendering engine configured to render a photorealistic 3D view of the composite image, including the luminosity characteristics."  The parties dispute the meaning of "render"/"rendering" and "photorealistic."

**1.      "Render" or "Rendering"**

In the context of the claims, "render" or "rendering" means to draw a 3D view of a 3D object and/or a 3D scene through the use of a software program such that the object and/or scene can be understood as having heights, widths, and depths such that they are capable of being seen from a plurality of views (*e.g.* wireframe, plan (floor), elevation).

"Rendering" requires construction because it has a meaning that is specific to the field of 3D computer graphics and is not known to lay jurors.  *See O2 Micro*, 521 F.3d at 1360 ("Words of a claim are generally given their ordinary and customary meaning, which is the meaning a term would have to a person of ordinary skill in the part after reviewing the intrinsic record at the time of the invention); *Tech Pharmacy Servs., LLC v. Alixa RX LLC*, 2016 WL 6397358, at *11 (E.D. Tex. Oct. 28, 2016) (agreeing that "construction is necessary" where a disputed claim term is "a technical term of art that would likely be unfamiliar to lay jurors," so as "[to] assist the jury

to understand the claims."). Although Plaintiff refuses to describe its understanding of the plain and ordinary meaning, the infringement contentions suggest that Plaintiff contends that rendering means to simply display an image or view. But, rendering must mean something different from displaying an image or view because the claims use both render and display *simultaneously*, which indicates the two words have different meanings. *See, e.g.,* claim 1 (separately reciting the step of "displaying a 3D scene with the GUI").

The claims and the specification do not expressly define "rendering." However, technical dictionaries make clear that rendering, in the context of computer graphics, refers to a set of processes used to create an image from geometric data that describes the image:[1]

> Render[:] To create an image suitable for outputting on a VDU or printer from a geometrical description of that image. Rendering therefore consists of processing a set of numbers that describe locations in some abstract space into a set of pixel coordinates and colour values for a real device. … In 3D graphics, rendering is the last and most-time consuming of the chain of operations required to produce a two-dimensional coloured picture from the internal model of the objects.

Dkt. 75-5 at 44; *see also id.* at 32 and 18. Consistent with this meaning, the specification uses the term "render" to refer to images that are drawn or created by a computer software program. '572 pat., FIG. 2 (depicting "rendering module"), 10:1-14 (rendering module "may be used to generate a 3-D rendering of the completed scene…in a format suitable for being displayed or printed…"), 11:42-53, 14:43-49 (describing that imaging is accomplished by performing low-

---

[1] Plaintiff argues that the dictionaries do not use the term "drawing" in their respective definitions of "render." Br. 18. However, those dictionary excerpts are cited *to provide support* for Defendants' construction of those terms – which is based on the disclosure in the specification and a POSITA's understanding of the ordinary and customary meaning of the terms "render" and "rendering" as of the priority date. *See* Dkt. 75-4, Goodin Rep. 24; Batts Decl., Ex. G (Goodin Dep.) 93:21-94:6. Neither Defendants nor Mr. Goodin have attempted to directly import the definitions of the term "render" from those excerpts into a proposed construction of that term.

level rendering followed by high-level rendering), 16:11-17:10 (describing high-level 3D rendering), 35:3-55 (describing user generation of a 3D scene through the client application); 35:56-36:9 (describing low-resolution/preview rendering and the high-resolution 3D view rendering).

Mr. Goodin explains that a POSITA would have understood the usage of the terms "render" and "rendering" in the aforementioned passages (and in the '527 patent more generally) to reference "a computer-implemented process — *i.e.*, taking codes for interactions between objects and drawing a resulting image on a computer display," reflecting "an elementary concept that is taught in introductory computer graphics courses."  Dkt. 75-4, Goodin Rep. 23. Defendants' construction thus applies the plain and ordinary meaning of rendering to the context of the claims by referencing the appropriate objects from the claims (*e.g.*, 3D view, 3D object, and 3D scene) and gives examples of the geometric information from which the image is drawn (*e.g.*, heights, widths, and depths).  Thus, Defendants' construction should be adopted.

Plaintiff has failed to present any evidence as to the ordinary and customary meaning of "rendering," let alone provide any explanation of what "rendering" would have meant to a POSITA.  Instead, Plaintiff makes the circular argument that the term "rendering" cannot refer to a computer software program drawing an image merely because the terms "render" and "rendering" appear in both the asserted claims and the specification.  Br. 17 (arguing that Defendants' "construction improperly conflates 'rendering' in the patent with 'drawing.'").  Plaintiff further argues that portions of the specification demonstrate that "the term 'draw' [is used] separately and differently from the term 'render.'"  Br. 17-18.  However, the cited portions of the specification demonstrate that "drawing" can refer to using a computer software program to generate a 3D object and/or 3D scene based on dimensional data that allows the generated

object or scene to be viewed in a plurality of views.  '572 pat., 13:7-12 (discussing a "user request to [a software program] to draw the actual plan of the room, *e.g.*, based on user-supplied room dimensions"), Table 3 (same), and Table 17 (same).

   2.    **"Photorealistic" and "Rendering…[render] a photorealistic 3D view."**

   In the context of the claims, a "photorealistic 3D view" means "having a resolution and color accuracy similar to that of conventional professional quality color photographs, including luminosity characteristics that are consistently applied within the context of the virtual environment."  The parties agree that a photorealistic 3D view "has a resolution and color accuracy similar to that of conventional professional quality color photographs."  That portion of the construction is drawn from the specification's definition of photorealistic.  '572 pat., 7:63-66, 17:1 (use of a rendering engine to "generate higher resolution, photorealistic images").

   The significant dispute between the parties is whether a "photorealistic 3D view" requires that luminosity characteristics be consistently applied within the context of the virtual environment.  This necessarily flows from the ordinary and customary meaning of "photorealistic" combined with immediately following claim language that requires the photorealistic 3D view to "include[e] the luminosity characteristics."  *See, e.g.,* claim 1. Defendants' construction correctly requires that that the luminosity characteristics in a "photorealistic" rendering comport with how light behaves in the real word.  For example, a photorealistic 3D view would never depict an object casting a shadow in a direction opposite to the direction of light from the only light source in the virtual environment.  In contrast, Plaintiff appears to contend that a high-resolution image with aberrant lighting effects can nevertheless be photorealistic.

   Defendants' construction is supported by the claim language, the specification, and the extrinsic evidence.  The asserted claims that recite a photorealistic 3D view further specify that it

"includ[es] the luminosity characteristics."  *See* claims 1 and 26-30.  In addition, the specification links the concept of "photorealism" to the application of luminosity characteristics to the rendered "composite" or "3D image" – defined terms that include both the 3D scene and the 3D objects placed therein.[2]  *See, e.g.*, '572 pat., 4:43-46 ("Luminosity characteristics may be applied to the 3D image; followed by rendering, with the client application, a photorealistic 3D view of the composite image, including the luminosity characteristics"), 5:35-37 and 6:6-8 (discussing the rendering of "a photorealistic 3D view of the composite image, including the luminosity characteristics"), and 8:17-21 (discussing how designers may generate "photorealistic images" through the use of "lighting effects and highly detailed models of furnishings," which "permit the rendered, composite images to appear photorealistic.").

Further, the prosecution history reveals that the patentee limited the meaning of the term "photorealistic" by clearly and unmistakably disavowing any possibility that the term does not require the application of luminosity characteristics to the "combined/integrated image" (*i.e.*, the 3D scene and the 3D objects that have been placed within it by a user).  *See, e.g., Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) ("Under the doctrine of prosecution disclaimer, a patentee may limit the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution."); *Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006) (holding that a prosecution disclaimer "may occur, for example, when the patentee explicitly characterizes an aspect of his invention in a specific manner to overcome prior art.").  More specifically, in order to overcome the *Kjallstrom*

---

[2]  The term "composite" is plainly defined by the claims of the patent as including both the 3D scene and the 3D objects imported into it by a user.  *See, e.g.*, claim 1(f) ("importing the 3D object into the 3D scene to generate a composite").  Similarly, the claims define "3D image" as a rendering of the composite performed by the client application.  *See, e.g.*, claim 1(h) ("rendering a 3D image of the composite at the client.").

reference cited in a May 31, 2007 non-final rejection, the applicants argued that each of the pending independent claims "recite[s] methods and systems configured for enabling a user to manipulate and render 3D images which include luminosity characteristics and are otherwise photorealistic" – which the applicants contended were not taught by the *Kjallstrom* reference. Dkt. 75-3 at 47-48 (Resp. to Office Action, ARDI000046-47).  Thus, the applicants clearly disavowed the possibility that the term "photorealistic," as used in the '572 patent, does not include application of luminosity characteristics to a 3D image.

Finally, the extrinsic evidence supports the construction.  Multiple dictionary definitions demonstrate that "photorealistic" was understood to require lighting effects be applied consistently throughout a virtual environment.  *See, e.g.,* Dkt. 75-5 at 17 (explaining that photo-realistic rendering "must take into account reflective properties, light sources, illumination…"), 31 (photorealism), 41 (photorealism), and 44 (photorealistic).  Further, Mr. Goodin explained that a POSITA would have understood the term "photorealistic" as it appears throughout the patent in the context of how that term "[w]as used in the 3D graphics academic and professional community" – which was as a reference to images "that were high-quality and included lighting effects so as to appear as if they were photographs of real scenes."  Dkt. 75-4, Goodin Rep 17. Mr. Goodin also noted that a POSITA would have understood the term "photorealism" to incorporate the knowledge that "even small discontinuities in the scene (for example, with respect to the consistent application of lighting effects throughout the scene) would break the illusion of photorealism for the entire scene" – a concept that he or she would have come to know through "academic studies and professional experience" in the field of 3D computer graphics.  *Id.*

**D.    "Reconfiguring" or "Reconfiguring" and "Selectively Reconfiguring [Reconfigure] the 3D Image in Real Time"**

Claim 1 recites "selectively reconfiguring the 3D image in real time."  The 3D image is rendered from a composite (element 1(k)) formed by importing a 3D object into a 3D scene (element 1(f)).  Claims 26-30 have similar recitations.  In the context of the claims and the patent, "reconfigure" or "reconfiguring" means "to rearrange the elements or settings of" the 3D image.

The patent does not expressly define "reconfiguring the 3D image."  However, the patent describes that "the user may perform additional editing tasks 120 and rendering effects application 122" after a low resolution 3D view is rendered (*e.g.*, element 1(k)) and before the high quality 3D images are rendered (*e.g.*, element 1(h)).  '572 pat., 14:50-54, 16:11-14. Examples of tasks include "[a]ddition, deletion, and modifications of objects within the room," "repositioning and re-dimensioning of objects," and "changing textures and swatches of objects." *Id.*, 14:56-65 (Table 4).

The patent's use of reconfiguring in the claims and specification is consistent with the plain and ordinary meaning of reconfiguring as shown by dictionary evidence.  Dkt. 75-5 at 7 (defining "reconfigure" as "[t]o rearrange the elements or settings of," for example to "reconfigure the wiring in a switchboard"), at 55 (defining "reconfigure" as "to rearrange").  Mr. Goodin explains why a POSITA would have understood at the time that reconfigure means to rearrange the elements or settings of the 3D image because "the 3D design systems and/or applications in existence as of the Priority Date of the '572 patent commonly allowed their users to manipulate the 3D scenes and 3D objects that were being displayed – for example, to modify and/or substitute environmental elements of the virtual 3D scene that the user generated through

or uploaded into the application, or to change the placement, size and/or orientation of 3D objects within the 3D scene." *Id.*

Plaintiff's brief presents nothing more than unsubstantiated statements that the construction will confuse the factfinder (without explaining how or why there would be confusion), that it rewrites the terms narrowly (without explaining what is excluded from the claims' scope that should be included), nor any evidence or explanation of what a POSITA would have known "reconfigure" to mean at the time of the alleged invention.

**E.     "Plurality of Views"**

Claim 1 recites a method that requires "configuring the 3D scene for being selectively displayed in a plurality of views."  In the context of the claims and the specification, "plurality of views" means "at least two or more views of a 3D scene."

There can be no serious dispute that plurality of views requires construction because the specification makes clear that "view" has a special meaning in the context of 3D graphics and this patent.  For example, the specification is replete with examples of what constitute different views.  *See* '572 pat., 11:5-10 ("As shown, GUI 76 includes the capability to show various views, such as **plan (floor)** 90, **elevation (wall)** 92, **low resolution (e.g., wireframe) perspective** 94 and **high resolution (photorealistic) perspective** 96."), 13:22-24 ("In exemplary embodiments of the present invention, floor, **ceiling**, and wall (elevation) views may be generated…."), 14:17-21 ("Planning 110 typically involves generation of floor, ceiling, and **two elevations (e.g., side and front)**. From these views, application 12 may generate 118 a 3D wire frame view 94 (FIG. 4)…."); 14:33-35 ("The objects 43 (FIG. 2) may be mapped onto the **2D or 3D views** using placeholders visible in these views."), FIGs. 4 and 16-29 (depicting a GUI capable of showing various views).  As the specification's examples demonstrate, the patent distinguishes between

views based on differences in vantage point (*e.g.*, plan, elevation, and perspective) or type (*e.g.*, wireframe and photorealistic).

Defendants' initial construction[3] used the word "mode" to capture both types of differences because the patent itself uses the term "mode" in connection with views. '572 pat., 35:29-30 ("The door may be viewed in wireframe mode…."). And, this usage of "mode" is consistent with the dictionary definition of "view," namely the "mode or manner of looking at or regarding something." Dkt. 75-5 at 61.

Plaintiff argues that Defendants' initial proposed construction is "erroneous" because it incorporates the term "perspective," which Plaintiff appears to believe refers only to 3D images, and does not also "encompass" 2D images. Br. 19-21. This argument is admittedly difficult to follow. However, there is no conflict between the differing uses of the term "perspective" in the '527 patent as an adjective (e.g, the "perspective view" that appears in claim 11, referring to a 3D "view" of a scene), or a noun (*e.g.*, the specification's reference to a "perspective" as a "vantage point," which is agnostic to whether the view being presented is 3D or 2D). Regardless, given the Plaintiff's argument that patent does not provide adequate clarity as to the meaning of "perspective" – and its agreement that the "claim term 'views' … encompasses both 2D and 3D 'views'" (Br. 20) – Defendants have revised their construction to avoid the term. There is no merit to Plaintiff's argument that there is no basis for substituting "at least two" for "plurality" because Plaintiff agreed in the IPR proceedings that it is the well-understood meaning

---

[3] The only difference between Defendants' initial proposed construction and its IPR construction (*i.e.*, the addition of the language "modes for displaying") was intended to reflect the specification's express references to "modes" of viewing 3D content (*e.g.*, '572 pat., 35:29-30), and thus ***improve*** the accuracy of the proposed construction, rather than change its meaning (Dkt. 75-6 at 75:5-22 ("I don't think [the added language] actually changes the definition of the terms. It just clarifies the fact that the patentee [viewed] each one of the plurality of views as a different mode.").

of plurality.  Batts Decl., Ex. E (Patent Owner's Prelim. Resp. in IPR2021-00085) at 21 (arguing that "plurality" has a "well-understood meaning of 'at least two'"), Ex. F (Patent Owner's Prelim. Resp. in IPR2021-00271) at 23 (same).

Accordingly, Defendants propose that "plurality of views" be construed to mean "at least two or more views of a scene."  No further construction should be necessary so long as Plaintiff does not dispute that a view is a different view if it has a different vantage point or is displayed in a different mode or manner (*e.g.* wireframe, photorealistic, 2D, or 3D, etc.).[4]  Such a construction would capture the same meaning as the construction Defendants proposed in the co-pending IPRs without using the term perspective, which was that "A POSITA would have understood that a 'plurality of views' meant 'at least two or more perspectives of a scene' (*e.g.*, a top perspective, side perspective, two-dimensional perspective, wireframe perspective, etc.)."

F.    **"3D Scene" or "Scene"**

In the context of the patent and claims, a "3D scene" means "a virtual representation of a space, in which the space and objects in the space have heights, widths, and depths."

The patent refers to "3D scenes" and describes that "a need exists for an improved 3D design and visualization system … capable of enabling a user to quickly and conveniently generate or import 3D scenes, import and manipulate 3D objects in the scenes in real time, and which is capable of rendering them in photorealistic detail on the client computer." '572 pat., 4:18-24.  The patent gives "creating a room" as an example of opening a scene. '572 pat., 10:1-6, 12:59-61 ("…Room Planning 110 (FIG. 5) is logically a first step for users wishing to design and render a scene.").  The room planning tools make clear that the room itself, as well as objects

---

[4]  Any attempt by Plaintiff to dispute this understanding of the term "view" would conflict with the construction that Plaintiff proposed in the two IPR proceedings for the term "view," should the Board find that the term requires construction – which referenced "two-dimensional and/or three-dimensional views."  Batts Decl., Ex. E at 24, Ex. F. at 26-27.

imported into the room, each have dimensions. *Id.*, 13:3-6 ("[T]he user may begin planning 114 the room from scratch. ***This may be accomplished by allowing the user to enter the coordinates (x, y, z dimensions) of the room*** …."), Tables 1 (describing "[d]rawing and re-dimensioning of the floor[, ceiling, or walls] either by dragging and dropping 112 templates … , or by ***specifying the x, y, and z co-ordinates 114*** as shown in window 98 (FIG. 6) …."), Tables 2-3.  Figure 8 depicts an object having dimensions.

The specification makes clear that a 3D scene is made up of elements that have dimensions so that a 3D rendering of the scene is possible:

> Turning now to FIG. 9, a user may open application 12, to a blank GUI screen 202, which includes a work area 204, library of objects 206, a camera view portion 208, and a navigator window 210. As shown in FIG. 10, ***design dialog 212 enables the user to specify*** such options as design units***, wall width and height, grid size and color, camera coverage, and line color of the camera*** …. The completed model ***may be viewed in various elevations/views***, such as isometric, using elevation tools 230 as shown in FIG. 22.

'572 pat., 35:3-55, 4:36-38 ("The method also includes configuring the 3D scene for being selectively displayed in a plurality of views."), 5:23-25 ("[A] display module configured selectively display the 3D scene in a plurality of views."), FIGs. 9-16.  The specification describes how users can set "click-points" in the 3D scene to view the scene from different angles, further demonstrating that the scene has space and objects in that space that are represented by heights, widths, and depths.  *Id.*, 17:6-8 ("The user may have the ability to define a series of camera click-points on the 3D scene depending upon desired viewing angles.").

Plaintiff does not offer any explanation of the ordinary and customary meaning of "3D scene," let alone any evidence.  Plaintiff's contention that 3D scene has a plain-English meaning is belied by one court's description of a "3D scene" within the context of 3D graphics:

> In 3D computer graphics, computers generate two-dimensional images to represent three-dimensional scenes. In general, a three-

> dimensional scene is first established by specifying the objects in the scene, how they are lit, and from which point(s) and which angle(s) they will be viewed ('viewpoints').  Producing two-dimensional images of that three-dimensional scene requires the specification of a viewpoint and viewing direction relative to the scene….  For example, in a scene where a cube sits behind a sphere from the perspective of the simulated viewer, the sphere would block the viewer from "seeing" some or all of the cube…. In order to determine which surface should appear in an image from a given viewpoint, the relative "depth" in the scene (*i.e.,* location on the z-axis) for the various object surfaces must be determined and compared.

*Fuzzysharp Techs. Inc. v. Intel Corp.*, 2013 WL 5955668, at *1-2 (N.D. Cal. Nov. 6, 2013).  The

*Fuzzysharp* court's description of a "3D scene" in the field of 3D computer graphics

demonstrates that the term has a particular meaning in the art that combines the concepts of

"space," "objects" within that "space," "viewpoints," and "depth," and supports Defendants'

construction.

## G.    "3D Image of the Composite"

Claim 1 recites "rendering a 3D image of the composite at the client."  The term

"composite" is defined by the claims to include both the 3D scene and the 3D objects imported

into it by a user.  *See, e.g.*, claim 1(f) ("importing the 3D object into the 3D scene to generate a

composite").  Similarly, the claims define "3D image" as a rendering of the composite performed

by the client application.  *See, e.g.*, claim 1(h) ("rendering a 3D image of the composite at the

client.").

Defendants initially identified the term "3D image of the composite" and proposed a

construction consistent with its construction of 3D scene, namely that the 3D image of the

composite is "a virtual representation rendered at the client of the 3D scene along with any 3D

objects imported into the scene by the user."  *See, e.g.*, Batts Dec., Ex. B (identifying "3D image

of the composite" for construction); Ex. D (proposing construction).  Plaintiff's initial position

was that this term did not require construction. Batts Dec., Ex. C at 5 (arguing that "no construction [was] necessary" for "3D image of the composite"). However, in its Preliminary Responses to both IPR Petitions filed after its Patent Rule 4-2 disclosures, Plaintiff explicitly took the opposite view, *i.e.*, that the term requires a 3D object in a 3D scene. Batts Dec., Ex. E at 29 ("[T]he claim limitation requires a 3D image of 'the composite,' which is a 3D object *in a 3D scene*.") (emphasis in original)); Batts Dec., Ex. F at 34-35 ("[T]he claim limitation requires a 3D image of 'the composite,' which is a 3D object *in a 3D scene*.") (emphasis in original); *see also id.* at 43 (same). Incredibly, Plaintiff now chastises Defendants for including "3D scene" in the construction of this term. Br. at 23 ("Defendants incorporate the same mistake into the term '3D composite of the image' by explicitly using the phrase '3D scene' in their 'construction' of this term. The intrinsic record does not support Defendants' attempts to rewrite these claim terms, as those rewritings are inconsistent with the usage of both terms in the specification of the '572 patent."). Although it is not clear which of Plaintiff's competing positions it is now advocating, the claims are clear on the connections between the 3D image of the composite with the 3D scene and imported 3D objects—as admitted by Plaintiff in the IPRs—and Defendants do not believe a separate construction of this term is necessary in view of their construction for "3D scene."

## H.    **"First Rendering Engine" and "Second Rendering Engine"**

Claims 26-29 of the '572 patent claim two distinct rendering engines—a "first rendering engine" and a "second rendering engine." *See* '572 patent, cl. 26-29 (claiming "a first rendering engine for rendering a 3D image of the composite at the client" *and* "a second rendering engine configured to render a photorealistic 3D view of the composite image, including the luminosity characteristics"). In the context of the claims and specification, "first rendering engine" means "a software package that is utilized to draw low-quality images, distinct from the second

rendering engine."  And, "second rendering engine" means "a software package that is utilized to draw high-quality images, including luminosity characteristics, distinct from the first rendering engine."

This claiming—and Defendants' constructions—are consistent with the specification, which explains using a low level rendering engine to render images related to "planning 110 and initial imagery 118, 120, and 122," as opposed to "higher resolution, photorealistic images."  *Id.* at 16:11-17:25.  The specification further describes how these "low level" and "high level" rendering engines each have different purposes.  *Id.* ("As mentioned above, once planning 110 and initial imagery 118, 120, and 122 is complete, application 12 may use high level rendering engine 74 (FIG. 3) to render 126 high quality 3D images."), 14:43-49 ("Imaging 118, including rendering effects application 122, is typically accomplished using low level engine 72 (FIG. 3)…. Higher level (e.g., photorealistic) rendering 126 may be accomplished once the planning phase is substantially complete.").  The specification further illustrates the use of two rendering engines in Figure 3:



**FIG. 3**

'572 pat., 10:25-30, FIG. 3 ("Turning now to FIG. 3, the architecture of an exemplary embodiment of client application 12 is described. As shown, application 12 includes a modeling engine 70, coupled to low level rendering engine 72, and to high level rendering engine 74. Each of the engines 70, 72, and 74 are communicably coupled to a GUI 76.").  Thus, in claiming two separate rendering engines, the inventors envisioned two distinct components, one that was "utilized to draw low-quality images" (i.e., the "low level rendering engine 72" in Fig. 3) and another that was "utilized to draw high-quality images" (i.e., the "high level rendering engine 74" in FIG. 3).

The unrebutted expert opinion of Mr. Goodin confirms the correctness of Defendants' construction.  In particular, Mr. Goodin explains that: "a POSITA would have understood that the claimed 'first' and 'second' 'rendering engines' were two separate software packages that were intended to be used in tandem as part of the purported invention."  Dkt. 75-4, Goodin Rep. 33.  Mr. Goodin further explains that "[t]he first software package would be a low level rendering engine intended to be used during the planning phase, and the second software package would be a high level rendering engine intended to generate photorealistic images after the planning phase was complete." *Id.*  Thus, a POSITA would have understood  a "first rendering engine" as meaning "a software package that is utilized to draw low-quality images, distinct from the second rendering engine," and a "second rendering engine" to mean "a software package that is utilized to draw high-quality images, including luminosity characteristics, distinct from the first rendering engine." *Id.*

Plaintiff's argument that "no construction is necessary" because "[t]hese two phrases do not have any specialized meaning in the art or in the context of the patent" (Br. 26) is undermined by the intrinsic evidence and Mr. Goodin's unrebutted testimony.  As an initial

matter, Plaintiff's attempt to attack the proposed constructions because they utilize the word "draw" fails for the same reasons as discussed with respect to the term "render" above.  Next, Plaintiff's attempt to collapse the "first" and "second" rendering engines into a single software package violates the basic tenets of claim construction that require each claim term to have meaning.  *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention." (cleaned up)).  This is particularly true where the inventors chose to specify "first" and "second" structures and claimed them separately.  *Estech Sys., Inc. v. Target Corp.*, Case No. 2:20-cv-00123-JRG-RSP, Dkt. 159 at 36 (E.D. Tex. Mar. 21, 2021) ("The issue in dispute appears to be whether the first, second, and third LANs and the WAN that are separately recited in the claims are distinct components. They are. This is the plain import of separately reciting elements in a claim and Plaintiff has not established another meaning such that would allow, for example, that the first and second LANs to be the same singular LAN."); *Gree, Inc. v. Supercell Oy*, 2020 WL 2476497, at 37 (E.D. Tex. May 14, 2020) ("The issue in dispute appears to be whether the 'third unit' is necessarily distinct from the 'first unit,' 'second unit,' and 'stronghold' that are separately recited in the claims. It is. This is the plain import of separately reciting elements in a claim and Plaintiff has not established another meaning such that would allow, for example, that the third unit and the first unit to be the same singular unit.").  The specification further acknowledges as such, clearly identifying the use of two distinct software packages for these two rendering engines.  '572 pat., 10:61-65 ("An exemplary high level rendering engine 74 is ***LightWorks^TM version 7.2*** …. A low level engine 72 suitable for use with embodiments of the present invention is the ***HOOPS 3D^TM Product Suite, version 8***…."). Therefore, the "first" and "second" rendering engines cannot be

from the same software package as Plaintiff argues and the Court's construction of these terms should reflect their distinctiveness.

## I.    "Integrated Product Ordering Information"

Claim 26 recites a server that includes "integrated 3D objects, including the plurality of 3D objects with their integrated product ordering information. Claims 28 and 29 recite similar limitations. In the context of the patent, the term "integrated product ordering information" means "product data relating to a 3D object (including available materials, textures and finishes, sizes, colors, cost quantity, and manufacturing lead times)."

The patent describes product ordering information in the passage at 8:65-9:12. The passage describes "product ordering information such as available options (e.g., colors, textures, sizes, etc.) and availability, manufacturing lead times, etc." that can be "stored with the 3D models in library 19…." *Id.*, 9:6-11, 8:11-9:2 (equating 3D models with 3D objects). The passage at 17:48-64 gives additional examples of properties associated with 3D objects, including cost information, dimensions, discount options, model number, order information, and shipment time.

Dictionary evidence demonstrates that "integrated," when used in the computing field, refers to the combination or merger of different elements or components into a single unit. Dkt. 75-5 at 13 (defining "integrated" as "[a] collection of distinct elements or components that have been built into one unit."), 35 (defining "integrated" as "[a] type of design in which two or more basic components or functions are physically, as well as electrically, combined."), 48 (defining "integrated" as "[a] popular computer buzzword that refers to two or more components merged together into a single system," and that "[i]ncreasingly, the term 'integrated software' is reserved for applications that combine word processing, database management, spreadsheet functions, and communications into a single package."). Thus, the combination of "integrated" with "product

ordering information" suggests that "integrated product ordering information" is the product ordering information described by the patent that is combined with a 3D object. Mr. Goodin's unrebutted testimony reflects that a POSITA has understood that the term "integrated" in the technical sense – as referring to a "closed or self-contained" program or file that does "not requir[e] any calls to external programs or data repositories" – and that the complete claim term would refer to the combination of the "product ordering information" disclosed in the specification with a 3D object. Dkt. 75-4, Goodin Rep. 29-30.

Plaintiff admits that the claims and the specification indicate that "the integrated product ordering information is plainly something that is combined with a 3D object to yield an integrated object." Br. 24. Thus, the only remaining dispute between the parties is to define for the jury what that something is. Defendants' construction provides the necessary guidance and is drawn from specification.

Plaintiff's contention that Defendants' construction improperly makes the integrated 3D object "part of the definition of 'integrated product ordering information' itself" distorts the nature of the proposed construction. Br. 24-25. The proposed construction merely *references* the 3D object with which the product ordering information is integrated, and describes the *nature* of an integrated data set to provide helpful context to the jury. These references and description hardly render the "combining" step (d) in claim 24 superfluous, as that step presents the process ("combining") that yields the "integrated product ordering information." However, even if this objection was valid, it has been resolved by the removal of "which 3D object can be specified and reconfigured by a user in real time" from Defendants' construction.

**J.**    **"Customized Graphical Document"**

Based on the understanding that Plaintiff is not contending that the preambles of claims 27-29 state limitations on the claims, Defendants agree that no construction of "customized graphical document" is necessary.

Respectfully submitted,

Dated:  April 5, 2021          By      */s/ Bradley D. Liddle*
                                       Bradley D. Liddle
                                       bliddle@carterarnett.com
                                       Texas Bar No. 24074599
                                       Monica Litle
                                       mlitle@carterarnett.com
                                       Texas Bar No. 24102101
                                       CARTER ARNETT PLLC
                                       8150 N. Central Expy, 5th Floor
                                       Dallas, Texas 75206
                                       Telephone No. (214) 550-8188
                                       Facsimile No. (214) 550-8185

                                       Harper Batts (CA Bar No. 242603)
                                       Chris Ponder (TX Bar No. 24065916)
                                       SHEPPARD MULLIN RICHTER & HAMPTON
                                       379 Lytton Avenue
                                       Palo Alto, CA  94301
                                       Tel: 650-815-2676
                                       Fax: 650-815-4664
                                       hbatts@sheppardmullin.com
                                       cponder@sheppardmullin.com

                                       Kevin A. Ryan (DC Bar No. 242493)
                                       SHEPPARD MULLIN RICHTER & HAMPTON
                                       2099 Pennsylvania Avenue, NW, Suite 100
                                       Washington, D.C. 20006
                                       Tel: 202-747-1900
                                       Fax: 202-747-1901
                                       karyan@sheppardmullin.com

                                       *Attorneys for Defendants*
                                       *Ashley Furniture Industries, Inc. and*
                                       *La-Z-Boy Incorporated*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that all counsel of record who have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on April 5, 2021.

*/s/ Bradley D. Liddle*
Bradley D. Liddle
